Filed 9/9/15  P. v. Moore CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>KEVIN LAMAR MOORE,<br><br>        Defendant and Appellant. | A140333<br><br>(Sonoma County<br>Super. Ct. No. SCR602080) |

Kevin Lamar Moore appeals from convictions of robbery and assault by means of force likely to produce great bodily injury.  He contends his constitutional right to due process was violated by trying him jointly with a codefendant who engaged in disruptive behavior at trial and whose defense was incompatible with appellant's.  He additionally argues the trial court failed to instruct the jury properly on the intent required for him to be found guilty as an aider and abettor of the robberies.  We affirm.

**STATEMENT OF THE CASE**

Appellant and codefendant Elijah Matthew Hall were charged by information filed on February 22, 2013, with two counts of first degree robbery (Pen. Code, § 211),[1] against victims Robert Ehrhardt (count 1) and Jonathan Gomer (count 2).  It was alleged that Hall personally inflicted great bodily injury on Gomer in the commission of count 2, and Hall was additionally charged with battery resulting in serious bodily injury of Gomer (§ 243, subd. (d)).  Appellant was charged with two counts of assault by means of

---

[1] Further statutory references are to the Penal Code unless otherwise indicated.

1

force likely to produce great bodily injury (§ 245, subd. (a)(4)), on Gomer (count 4) and Ehrhardt (count 5). It was alleged that appellant had suffered four prior convictions of serious or violent felonies (§§ 1170.12, 667, subd. (a)(1). Hall was alleged to have suffered three prior felony convictions (§ 1203, subd. (e)(4)) and served a prior prison term (§ 667.5, subd. (b)), with two of the prior convictions alleged to be serious or violent felonies (§§ 1170.12, 667, subd. (a)(1)).

Appellant entered pleas of not guilty, denied the special allegations and sought severance of his trial from Hall's. The motion to sever was denied. Trial on the prior convictions was bifurcated. At trial, after the prosecution rested, count 5 was dismissed on the prosecutor's motion. On March 26, 2013, the jury found appellant and Hall guilty of all the remaining counts. The jury subsequently found all the prior conviction allegations true.

After the verdicts, defense counsel filed a motion to strike the prior convictions. Appellant moved to substitute counsel and, following a *Marsden*[2] hearing on May 10, the motion was denied. In July, however, appellant's case was taken over by a new attorney, who filed a motion for a new trial. On October 31, the court denied the motions to strike and for a new trial, and sentenced appellant to a total prison term of 35 years to life.

Appellant filed a timely notice of appeal on November 20, 2013.

## STATEMENT OF FACTS

On May 9, 2011, Jonathan Gomer and his friend Robert Ehrhardt had some people over to Gomer's house to make music. Gomer had created a music studio in one of the rooms of the house, an area partitioned off by curtains hung from the ceiling to improve sound quality, with foam on the walls and equipped with a microphone, keyboard, and computer. During the day, Gomer received a phone call from a person he knew as "Sicc" and identified at trial as Hall. He had met Hall once, through a friend, a year or so before. Hall wanted to hang out, and Gomer invited him to the house.

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

Hall arrived in the afternoon or early evening with a woman Gomer thought was Hispanic or possibly Indian. The people already at the house were drinking beer and relaxing around the house, "[b]eat" playing in the background, and "scribbling lyrics out to try to write stuff." About two hours after Hall arrived, a friend of his came over whom Gomer had not previously met. Gomer could not recall this person's name but when asked if his nickname was "K," Gomer said that sounded familiar. Gomer identified appellant at trial as this person.

Another man associated with Hall also came to the house, whom Gomer described as African-American, "6-foot or 6-foot-1 and about 200 pounds." Hall, appellant, and this third man mingled with everyone at the house, but appeared to know each other. The other people at the house that evening were Jason Huff and his girlfriend Catherine Boyd, Nathan Wilson and Auston Cowan; Henry Gill had been there earlier in the day but left before evening. At some point the group ran out of beer and Hall or one of his "crew" paid for an additional two "40 ounces" of beer. The woman who had come with Hall was not feeling well, and "they" put her in Gomer's room "without asking."

Later in the evening,[3] the people remaining at the house were Gomer, Ehrhardt, Hall, Hall's two friends, and the woman who had come with Hall. Gomer and Ehrhardt went into the studio to record. Ehrhardt was standing at the desk and Gomer put the headphones on, listening to the beat or instrumental while speaking into the microphone. With the headphones on, Gomer could not hear what was going on in the rest of the room, and the blanket kept him from seeing the room outside the studio area. He had consumed somewhere between 40 and 80 ounces of beer and was "buzzed" but not "drunk." Gomer remembered "trying one take," messing it up, and trying again; the next thing he remembered was waking up in the hospital.

All Gomer remembered of the hospital was waking up for a few seconds and seeing his parents and a doctor. He next remembered waking up at his parents' house the

---

[3] Gomer testified that most of the people left his house by about 7:30 or 8:00 p.m. As will be seen, other witnesses and the medical records indicate a later timeframe.

3

next day,[4] feeling a little bit nauseated and dizzy, his lip "really swollen" and seven stitches on the inside of his jaw. He did not remember being interviewed by the police at the hospital. According to the medical testimony, Gomer suffered a laceration on his left lip, a concussion, and a fractured nose. His blood alcohol level was measured as 0.199. He was released from the hospital after about two hours.

When Gomer returned to his house later that day, he noticed several things missing: the 40-inch TV from his living room; from the studio, his laptop, his cell phone, his house keys and car keys, his keyboard, and Ehrhardt's cell phone, and a 19-inch monitor from his bedroom. He later noticed that his camera, which had been in the studio, was also missing.

Ehrhardt also identified Hall at trial as the person known as "Sicc" who came to Gomer's house on May 9. Ehrhardt had not met Hall before but had seen him the prior weekend, when Ehrhardt was at Gomer's house and Hall came by looking for Gomer. On the day of the incident, Gomer greeted Hall with "[j]oyous, shall we say, open arms." They all gathered in the studio, "listening to beats." About an hour or hour and a half later, an African-American male arrived at the house who Ehrhardt had not met before but recognized as the person driving the car in which Hall had come to the house the prior weekend. Ehrhardt saw him drive up in a small gray Nissan. The man introduced himself as "K." At trial, Ehrhardt identified appellant as this man.

The group continued making music. People were drinking malt liquor, but Ehrhardt was not drinking because he was on probation. The woman who had come with Hall was on the couch in the living room, drinking, then Ehrhardt saw Gomer and Hall help her into Gomer's room. Around 11:00 p.m., Ehrhardt left to drive Cowan home, returning about half an hour later. K received a phone call and left in the Nissan, then returned half an hour later with another African-American man.

---

[4] Gomer was at the emergency room in the early morning hours of May 10, from about 2:00 a.m. until about 4:00 a.m., and awakened at his parents' house about 10:00 a.m.

4

Huff and Boyd left about 12:15 or 12:30 a.m., leaving Gomer, Ehrhardt, Hall, the woman, K., and the other African-American man at the house. Ehrhardt was at the computer, recording Gomer, who was rapping. Ehrhardt's back was to Gomer. Suddenly, Ehrhardt was punched in the face, then hit a few more times on the left side of his face. Ehrhardt tried to get Gomer's attention, yelling for him, then turned and saw Hall's face, and Hall hit him again. Gomer did not appear to be aware of what was happening outside the recording "booth"; Ehrhardt could hear him rapping. Appellant was standing by the doorway with the unidentified man just behind him. The unidentified man appeared slightly surprised at what was happening; appellant did not appear surprised.

Hall stopped hitting Ehrhardt, went to the curtain and told Gomer, "keep it up, you are doing a good job." Hall then ripped the curtain down with his right hand, grabbed Gomer with his left, and hit Gomer twice. Ehrhardt heard Gomer shout, "I thought we were friends, what the F is going on," then Hall punched him once more and Gomer dropped to the floor with his eyes rolled back in his head and did not move. Ehrhardt stood up. Appellant grabbed a chair, lifted it a few inches, asked Ehrhardt, "[w]hat are you going to do?" and told him to get down on the ground.[5] Erhardt noticed that appellant was wearing heavy work gloves that he had not been wearing earlier in the evening.[6] Bleeding from his nose and scared, Ehrhardt lay down, put his hands behind his head and kept his eyes closed. He heard rustling that sounded like the studio equipment being picked up off the table, and felt someone going through his pockets, taking his cell phone and Gomer's keys. He heard talking and recognized one of the voices as Hall's.

---

[5] Ehrhardt acknowledged on cross-examination that it could have been the other man who told him to get down on the floor, later explaining that he did not see whose lips moved and that he was "foggy" at the time of trial. In his statement to the police shortly after the incident, he said that K told him, "Get down on the ground, motherfucker."

[6] Deputy Sheriff Charles Blount, who responded to Gomer's house about 1:00 a.m. on May 10, testified that Ehrhardt told him that during the assault he noticed three people wearing gloves.

Ehrhardt heard the rustling sounds of people moving through the house for 10 or 15 minutes, then heard the door shut and car start.

After staying on the floor another five or ten minutes to make sure nothing else was going to happen to him, Ehrhardt checked on Gomer, who was still in the same position on the floor, unconscious. Ehrhardt went to lock the door and check the windows, and when he returned, Gomer was starting to move, moaning and groaning. Blood was "pouring" out of Gomer's mouth and he had no recollection of what had happened; he thought they were still partying and he had gotten drunk and passed out. He said he was going to bed and stumbled there with Ehrhardt helping him. Law enforcement was contacted and Gomer was taken to the hospital. Later, when they returned to Gomer's house, Ehrhardt noticed that the large TV was missing from the living room, a keyboard, a laptop, and a computer monitor were missing. There were blood stains "everywhere" on the floor of the studio.

Detective Shannon McAlvain interviewed Gomer at the emergency room. Gomer was awake and conscious but disoriented and confused about what had happened during the incident, saying several things that did not make sense. He said someone named Henry had been involved, but did not say what Henry's involvement was. He initially said there had been two African-American men at his house that night, then said there were three, then "kind of bounced around." McAlvain spoke with Ehrhardt in the waiting room, who described what had happened and said a person named K told him to get down on the ground. Ehrhardt did not appear to be under the influence of alcohol. McAlvain called some of the people Ehrhardt had said were at Gomer's house that night. Huff initially said he did not have any prior knowledge of the suspects, then later said he knew Sicc from around town.

Detectives McAlvain and Dedischew went to Gomer's house and located the phone number (707-291-7495) from which Sicc had called Gomer earlier in the day. It was determined that this phone number was associated with Hall and that Hall's girlfriend was Stephanie Contreras. Photographic lineups were created containing Hall

6

and Contreras, which McAlvain showed to Gomer and Ehrhardt. Gomer identified Hall and Contreras.[7] Ehrhardt identified Hall and "slightly recognized" Contreras.

Hall was arrested on May 11, after the detectives employed a ruse to have him meet them at a location in Santa Rosa. Detective Brandon Cutting went to the location when informed by other officers that Hall was present and observed a tan Nissan Maxima that met the description of the vehicle used by the suspects. Walking to the building, Cutting saw Contreras walking in his direction and spoke with her briefly. The Nissan was identified as the car in which Contreras and Hall had arrived. Cutting saw a black man walking toward the Nissan; when two other detectives approached and told him to stop, the man continued walking toward the driver's door of the car. As the officers yelled "sheriff's office" and drew their firearms, the man got into the car and took off at high speed. Cutting ran to his car, activated his lights and siren and pursued the Nissan but lost sight of it.

When he returned to the building, Cutting spoke with Hall, searched his cell phone and found several phone numbers, one of which was connected to appellant. He obtained a photograph and immediately recognized appellant as the driver of the Nissan. Another photographic lineup was created containing appellant's photograph. McAlvain showed Gomer this lineup, as well as two others that had been created in an attempt to identify the third suspect.

Gomer did not identify appellant in the lineups; in two lineups that did not contain appellant's photograph, he pointed to one individual as "[m]ost similar" but "[t]oo young and not enough wrinkles" and another as looking "similar" to the "older man" who had been at the house. Shown the lineup containing appellant's photograph at trial, Gomer recognized that photograph as the person referred to as K. Looking at appellant in court, Gomer was 99.9 percent confident appellant was the "older gentleman" at his house on the night of the incident.

---

[7] Shown Contreras's photograph at trial, Gomer testified that he was 90 percent confident this was the woman who had been at his house but not 100 percent sure.

None of the property taken from Gomer's house was found in a search of Hall's residence. None of the property was found in appellant's possession.

Several of the people who had been at Gomer's house on the night of May 9 testified. Auston Cowan testified that Hall, whom Cowan identified at trial, arrived with a friend named King and a girlfriend. Cowan had last seen Hall at Gomer's birthday party a year before; he had never seen King before and did not see him in the courtroom at trial. An African-American male arrived whom Hall introduced as his friend. Cowan had a "weird" feeling about Hall bringing his friends to the house because Cowan and Gomer had not seen Hall for a year, and told Gomer he should probably ask them to leave. Cowan got a ride home from Ehrhardt about 11:00 p.m. Cowan identified Hall on the lineup he was shown by the police. He testified that he did not identify anyone in the lineup containing appellant's photograph, and at trial he did not recognize anyone in that lineup as having been at Gomer's house. On the lineup itself, however, Cowan indicated a positive identification of appellant and McAlvain testified that Cowan identified appellant in the lineup without hesitation.

Katherine Boyd testified that when she and Jason Huff arrived, Gomer and Ehrhardt were in the studio with two African-American men Boyd did not know and a woman she did not know was on the living room couch. The mood was happy. As she and Huff were leaving, before midnight, two people were arriving, a taller man and a woman. Shown the police statement in which she described a group of four arriving at Gomer's and leaving at the same time she left, Boyd struggled to remember the details and testified that the one thing she was sure of was that the only people remaining at the house when she left were Gomer, Ehrhardt, and the two men and one woman who were there when she arrived.[8] Shown the photographic lineups, Boyd was positive in identifying Hall as having been at Gomer's house on the night of the incident, 50 percent

---

[8] Boyd had told McAlvain that about 30 minutes after she arrived at Gomer's house, she saw a car arrive with two African-American male adults, an African-American female, and a white female. This group left the house at the same time Boyd left, and she did not think the four were associated with the three suspects in the case.

sure in identifying Contreras and did not identify anyone in the other lineups. At trial, she identified both appellant and Hall.

Jason Huff testified that one of the African-American men who was at the house when he arrived, whom Huff identified at trial as appellant, asked Huff to move his car so appellant could go to pick someone up. Huff remembered that someone else arrived later but Huff could not recall who; asked about his statement to the sheriff's deputies that four people arrived in a car, he remembered but did not know who they were. Huff did not recall telling a detective that he saw appellant return with the third suspect around 11:00 or 11:15 p.m. In the photographic lineups, Huff identified Hall and was 80 percent sure in identifying Contreras. He was 90 percent sure in identifying appellant and, at trial, testified that appellant was the person he had picked from the lineup. Huff also identified Hall at trial. He had described the suspect he identified as Hall as having a "lazy left eye," and McAlvain testified that Hall had a "wandering left eye."

Jenee Dumolin described going to Gomer's house with her boyfriend, Henry Gill, and another couple, Daniel and Rachel, around 10:30 p.m., finding Gomer and Ehrhardt there with three African-American males she did not know and a woman sleeping on the couch.[9] After a while, Dumolin felt a "weird vibe" because the three males were staring at her; these three left before Dumolin and her group left. Dumolin identified both Hall and appellant in the photographic lineups; at trial, she identified Hall but not appellant.

A recording was played for the jury of a phone call Hall made from jail to Contreras on June 19, 2011. In the call, Hall alternated between talking calmly and yelling profanities at Contreras; even when talking calmly, his speech was punctuated with curses. He repeatedly insisted that Contreras call a phone number (707-235-5632) that the evidence showed belonged to Cowan: "I got a number, too, for you to fuckin' call," "text that little shit like I talked to you about . . . get a mother fuckin' answer . . . see what the fuck's goin' on." Whenever she hesitated, expressed discomfort about

---

[9] Neither Gomer nor Ehrhardt had recognized the name Jenne Dumolin when asked about the people at Gomer's house on the night of May 9.

9

doing this or asked questions about it, Hall instantly became belligerent, angrily yelling and cursing at her. He repeatedly insisted that she come to visit him so they could talk.

Auston Cowan testified that two or three weeks after the incident, he received a call on his cell phone (707-235-5632) from a male who called Cowan by name but refused to provide his own name. The caller said he was calling about his "homie," whom Cowan assumed to be Hall, and asked Cowan to tell Gomer that he would be given money if he did not testify. Cowan told Gomer and Ehrhardt about the call. Gomer testified that he received a phone call from Cowan about two to four months after the incident saying that someone had contacted him and offered a sum of money for Gomer to not testify in this case.

### Hall's Defense Evidence

Detective Jeff Dedischew interviewed Gomer on May 11. Gomer said he was intoxicated at the time of the incident, ended up face down on the carpet, and assumed he had been knocked out. He told Dedischew he had stitches in his mouth and head.

Forensic Scientist Okorie Okorocha testified as an expert on the effects of alcohol upon an individual's consciousness and ability to perceive and relate. Okorocha testified that alcohol, at higher levels, can cause mental confusion, loss of memory, and unconsciousness. Each person may be affected differently by a given level of alcohol: For example, the effect of alcohol can differ depending on whether a person is a heavy drinker, and certain people are prone to alcohol induced blackouts while others rarely have them. A blood alcohol concentration of 0.20 is high enough to cause memory loss. If a person who loses consciousness has a 0.20 blood alcohol concentration and also has been subjected to blunt force trauma, it generally would not be possible to determine whether the alcohol or the trauma caused the unconsciousness.

Stephanie Contreras testified that she had had trouble with her memory since having a brain tumor removed. She remembered going to a house with Hall where he was making music with some other people. She was on the couch watching television; she fell asleep because she took her seizure medication after drinking a 40 ounce beer, but she was not drunk. At some point, Hall put her in the bedroom so she would not be

10

disturbed. She remembered that Hall became upset because he found that her clothes were undone, her pants unbuckled and her shirt "up." He took her back to the couch, telling her she would be safer in the living room where he could keep an eye on her. Hall later told her it was time to go and put her in the backseat of the car, where she fell asleep against him. She recognized the car as belonging to K but did not know who was driving. Contreras testified, "I use the name K, because yes, I was told that K or— because I was informed by the defense or the other lawyer, I don't know that man from Adam. He's not my friend." She testified that she did not know Kevin Moore, then after being asked by the prosecutor about having told Detective Cutting that she knew Kevin Moore from prior contacts, stated that she had met him on two occasions but did not hang out with him and was not introduced to him as Kevin Moore.[10] The next morning, she saw that the people who had been in the front of the car were Buddy and Kevin Moore.

Contreras testified that on May 11, she and Hall got a ride from San Francisco to Santa Rosa from K. She testified that she did not see this person in the courtroom at trial, and she did not see Kevin Moore in the courtroom  Asked if the person she knew as K was Kevin Moore, Contreras replied, "I guess so."

Contreras testified that Hall had nothing to do with what happened at Gomer's house, and that she contacted Detective Cutting to tell him she was afraid because she had been receiving threats from Buddy Walker. She acknowledged that she had convictions for felony welfare fraud, misdemeanor theft, child endangerment, felony infliction of corporal injury to a child, lying to a police officer, and petty theft.

Hall identified appellant at trial as his friend Kevin Moore, called K. Hall testified that on May 9, 2011, he and Contreras went to Gomer's house in the late afternoon to "do music." Gomer, Ehrhardt, and Cowan were there when they arrived. Everyone went into the studio, where they listened to music and drank. Hall, Contreras, and Ehrhardt went to the store for alcohol. When they returned, Contreras stayed on the couch and the others

---

[10] Detective Cutting testified on rebuttal that Contreras told him that she knew Kevin Moore and that Moore and Hall were friends "from way back." Contreras also told Cutting she left Gomer's house with Hall, appellant, and Buddy Walker.

11

went back into the studio and began recording. From behind the curtain, Hall kept hearing the studio door open and when he looked out, Gomer would be by the couch. This made Hall nervous because of Contreras being on the couch. Hall finished the track quickly and went to sit on the couch. Four people he did not know arrived at the house.

Hall learned that appellant was trying to reach him, gave appellant Gomer's address and appellant arrived. Hall continued to listen to the recordings being made. He contacted another friend and said he had found some people making good music. Hall and appellant left to get Buddy, but before doing so Hall asked Gomer to make sure nothing happened to Contreras, who had gotten drunk and was lying on the couch. When they returned, Cowan and Ehrhardt were leaving. Cowan shook Hall's hand quickly, in a way that made Hall feel something was not right. When he went inside, Hall saw Contreras on the couch with her pants open and her bra "up." Feeling something had happened, Hall moved Contreras to Gomer's bedroom. Hall asked Gomer if anything had happened to Contreras and Gomer brushed him off. He asked others in the house if something had happened to Contreras but they were unresponsive. Hall felt the energy in the house had changed. When Ehrhardt returned, Hall asked him if something happened to Contreras and whether Cowan had been involved.

Hall testified that he was going in and out of the studio while Buddy was in the studio writing lyrics. Eventually, Hall moved Contreras to the car, then went back into the studio with Ehrhardt and Gomer. Hall hit Ehrhardt; asked why, he testified, "my emotions and my feelings towards [Contreras] and what I seen, I just didn't feel that was right that happened." Gomer came out from behind the curtain and ran toward Hall, and Hall hit him because he was shocked at Gomer running out and was still upset. Hall stood there for a minute, feeling bad about what happened, then left the studio. As he was walking out, appellant was coming in. Hall got into the backseat of the car with Contreras, then appellant and Buddy came out and got into the car as well. Hall testified that he did not take any property from the house or see anyone else doing so. He did not have a plan with anyone to steal anything from Gomer or Ehrhardt; the only thing on his

12

mind was hitting Ehrhardt and Gomer because of what he thought had happened with Contreras. He was not wearing gloves that night.

Asked about the taped phone call with Contreras, Hall testified that the police reports did not say that the reason the incident occurred was Hall's belief that Contreras had been touched. Hall acknowledged that he had been convicted of false imprisonment, attempted robbery, residential burglary, and receiving stolen property.

### *Appellant's Defense Evidence*

Psychologist Mitchell Eisen testified as an expert on eyewitness identification. He described imperfections in the processes of memory and how people use inferences to fill gaps in memory, and factors that can undermine the accuracy of a witness's memory. Alcohol intoxication can impair eyewitness memory. Cross-race identification can be problematic because it is more challenging for the witness to differentiate subtle features of the face of a person of a different race. Distinguishing features such as unique piercings, scars or haircuts are most easily remembered because they grab the witness's attention. Where witnesses share their observations, they will commonly accept details reported by another person they deem credible as if those details were their own memories. A person with larger gaps in memory of an event will be more likely to accept details from another source. The procedures used to collect and preserve eyewitness evidence can also affect an identification. To be fair, the subjects in a lineup must all be viable options based on the description of the suspect. A person's memory for a face can only be tested one time; after this, familiarity of the face will affect later identifications. By the time a witness makes an in-court identification, that identification has been influenced by events, discussions, pictures and rethinking since the time of the event. A witness's level of confidence in an identification does not necessarily equate with actual accuracy.

### DISCUSSION

### I.

Appellant contends that his constitutional rights to due process and a fair trial were violated by trying him jointly with Hall. He contends he was prejudiced by Hall's

13

disruptive behavior during trial; by the playing of the recording of Hall's call from jail to Contreras; and by Hall's testimony, which presented a defense adverse to appellant's.

" ' "Our Legislature has expressed a preference for joint trials. [Citation.] Section 1098 provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials.' The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. . . . [¶] We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' [Citation.]" [Citation.] . . . [Citation.]' (*People v. Homick* (2012) 55 Cal.4th 816, 848.)" (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1172-1173 (*Hajek*).)

### A.

Appellant's argument focuses on prejudice he asserts resulted from events at trial, not on the pretrial denial of his motion to sever his trial from Hall's. The first source of the claimed prejudice is Hall's behavior at trial, which was so disruptive that the court eventually had to remove him from the courtroom for much of the trial. The disruption began with the first witness called by the prosecution. When the prosecutor began to question Gomer about being shown the photographic lineup, Hall interjected, "Are we going to be dealing with the identification[,]" pressing his point that the identification was "a serious problem" despite his attorney's and the court's attempts to stop his

14

interruptions.[11]  Shortly thereafter, the prosecutor having established that Gomer did not identify appellant from the lineups and the only person he had confidently identified was Hall, Hall interrupted with, "You want to talk about description, did he give a

---

[11] The exchange was as follows:

| | |
|---|---|
| Prosecutor: | "When you made the selection, that was your opinion to the best of your ability, is that right?" |
| Gomer: | "Correct." |
| Hall: | "Are we going to be dealing with the identification—" |
| Defense counsel: | "Elijah—" |
| Hall: | "—from the officer—" |
| Defense counsel: | "Elijah—" |
| Court: | "Mr. Hall, if you'll allow [the prosecutor] to complete his questioning, your attorney will cross-examine." |
| Hall: | "The identification is a serious issue." |
| Court: | "Mr. Hall—" |
| Hall: | "It hasn't been—" |
| Court: | "Mr. Hall—" |
| Hall: | "—brought out loud.  Yes." |
| Court: | "Mr. Hall.  Mr. Hall.  Please restrain yourself.  Thank you.  [¶]  [Prosecutor], you may continue." |
| Prosecutor: | "Thank you, Your Honor.  I'm going to have some things marked first, Your Honor." |
| Hall: | "Shouldn't we play the tape?" |
| Court: | "Excuse me, Mr. Hall.  If you have questions please address them to your attorney and we'll discuss it during recess, thank you. |
| Hall: | "Yes, ma'am." |
| Court: | "Thank you.  [¶]  Go ahead, [prosecutor]." (Exhibits marked for identification) |
| Hall: | "You still need the recording as well." (Discussion with his counsel off the record.) |
| Hall: | "Everything ain't right.  I'll testify to it myself." |

15

description[.]" The prosecutor turned to the subject of Cowan telling Gomer about the phone call he received and Hall's attorney made a hearsay objection; the court explained to the jury what hearsay is and instructed it not to consider the evidence for any purpose other than to explain the effect of the statement on the witness's state of mind. Hall cut in, "That's a double edge standard."

At this point, the court declared a recess and, outside the presence of the jury, told Hall that despite having promised before the trial started to comport himself properly, he had attempted to interrupt the proceedings four or five times and been admonished each time.[12] The court told Hall his behavior was not making the jury think favorably of him and warned that he would be removed from the courtroom if he caused another disruption.[13] Hall acknowledged that he understood, then again attempted to raise issues about the identification, causing the court to again warn him he would be removed if he interrupted the proceedings.[14] After a recess and before the jury returned, the court warned Hall again that "one more outburst" would result in his removal, emphasizing the

---

[12] The court had been made aware that Hall had a history of being disruptive and noncompliant with orders during a pretrial hearing on the question whether a shackle, not visible to the jury, would be employed during trial. The court granted the motion of the sheriff's office to use the shackle.

[13] The court told Hall, "[T]his is not in any way making the jury favorable towards you. If you would observe the jury, they are disturbed by the disruption that you have caused, and I would strongly advise you to follow your attorney's advice. I'm warning you that if we have another disruption, if you speak out one more time in front of the jury, I will have you removed."

[14] Hall said, "It is issues that I've been studying for a while now dealing with this case whether it was identification, tainted identification due to the fact of the information from the Sheriff's Department coercing with . . . ." When the court interrupted with "Excuse me, Mr. Hall, your attorney . . . ." Hall continued, "[t]he different line-ups, ma'am." The court told Hall his attorney would have a full opportunity to address this in cross-examination, again directed him that it was "absolutely inappropriate" for him to interrupt the prosecutor's examination of the witness and warned that he could be "removed from the courtroom."

16

visible negative reaction the jurors were having to the disruptions.[15]  The trial then proceeded for another hour without interruption.

The next day, about an hour into Ehrhardt's testimony, when the witness answered "no" to the question whether he had received any medical treatment as a result of the incident, Hall interrupted, "Medical records disappeared out of the files, that's what happened."  After the court's "[e]xcuse me, Mr. Hall[,]" Hall repeated, "No, the medical records disappeared."

The court called a recess, reminded Hall at length that he had been warned about disrupting the proceedings and stated that it would remove him from the court.  Hall continued his comments about the medical records while the court ordered his removal.  The court stated for the record that Hall had "forfeited his right to be present to confront and cross-examine witnesses" by his "complete disregard and disobedience of the court orders to maintain decorum in the courtroom and not interrupt the witnesses."  The court agreed to allow recesses for defense counsel to consult with Hall as needed and, as necessary, to address the prosecutor's need to have witnesses make in-court identifications.  Appellant's attorney began to voice concern that appellant could be prejudiced by Hall's behavior, and the court directed her to make the argument at a break.

When the jury returned, the court explained that Hall was not present because he had violated the court's orders not to interrupt witnesses and asked for the jurors'

---

[15] Hall responded to the initial warning by saying he had "anxiety" and did not "mean to disrespect you or anything that's going on."  As he started to say, "I've been studying the case . . . ," the court told him he needed to control himself or accede to being removed and reminded him that the jury was not "favorably inclined" by his disruptions: "If there is any question you might want to observe the jury's eyes and faces when you do this.  I personally observed it and it is all that I could do to keep from calling a halt in the proceedings at the time it occurred.  I don't want to have to do that.  I don't want to have to remove you from the courtroom.  But you may leave me no choice because it is my duty to keep order in the court."

commitment not to draw adverse inferences from Hall's behavior and not to consider this behavior with respect to appellant.[16]

Near the end of the day, during Boyd's testimony, Hall was returned to the courtroom and ordered not to interrupt the proceedings, and Boyd identified Hall as having been at Gomer's house on the night of the incident. The following day, the third day of testimony, Hall was brought to the courtroom for identification during Huff's testimony, then removed at the end of his testimony. In response to Hall's attorney's concerns about Hall being able to assist with his defense, Hall was permitted to be present for Dumolin's testimony. He then asked to leave the courtroom while the recording of the jail phone call was played for the jury. Hall was present in court for most of the next five days of trial, throughout the remaining witnesses' testimony and the prosecutor's and his own attorney's closing arguments.

During appellant's attorney's closing argument, however, Hall interrupted repeatedly: "That's totally different"; "[t]hat's a lie"; "I'm not going to sit here and . . ."; "[t]hey are trying to make me out to be some kind of liar"; "[y]ou know, I'm not going to let her keep saying things that's a lie"; and, as the attorney asked the jury not to believe the story Hall had told, "[h]ow would you feel if you was molested though. Somebody

---

[16] The court stated, "You have noticed Mr. Hall is not present in this court. As you are aware, it is incumbent upon me and my duty as the trial judge to maintain decorum in this courtroom and I have advised Mr. Hall that he was not to interrupt the witnesses, and he did, in fact, disobey my order and for that reason I have had him removed from the courtroom for these proceedings. I am going to advise you again and remind you and ask that your commitment is that you follow my instruction, that the only evidence that you are to consider is the evidence coming from the witnesses who are testifying or the exhibits that I admit. I will ask that you have—that you commit that you will not draw any adverse inference from the behavior of Mr. Hall. He clearly was emotional and was unable to control himself to commit to following my directions, and it was my duty to keep this trial in a position of decorum and propriety. So do I have your commitment that you will not draw adverse influences from his behavior? Thank you. Similarly, I will ask your commitment that you are to hold absolutely none of that behavior at all in consideration when you determine Mr. Moore's particular situation as it relates to this case. Do I have that commitment?"

raped you, how would you feel." At this point, the court called a recess and removed Hall from the courtroom for the remainder of closing argument.

Describing the trial as having "degenerated into a kind of lion taming act with Mr. Hall destroying any semblance of judicial serenity and calm," appellant argues his trial became fundamentally unfair because Hall's "uncontrolled behaviors and threats of violence necessarily engendered fear in the jury, preventing [jurors] from making a reliable judgment based on the evidence admitted against [appellant]."

We are not persuaded. Hall's disruptive conduct during trial was one of the bases for appellant's argument, on his motion for a new trial, that he was prejudiced by the joint trial. Opposing this motion, the prosecutor observed, "when Mr. Hall did interrupt it was a verbal interruption. He did not rise out of his chair. He did not raise his voice. He did speak, and it distracted me, obviously, from the questioning I was doing; but it wasn't any kind of a yelling, a screaming, anything that would have raised the jury's mind—or raise in the jury's mind some kind of prejudice against Mr. Hall or Mr. Moore. [¶] This court allowed him several opportunities to make those interruptions, warning him after each one; but then before it turned into something more than it already was, the court interrupted the proceedings and excused Mr. Hall. There was an interruption by way of some comments made by Mr. Hall, and that's it. And perhaps that's not captured on the record in black and white; but I recall it that way, and I'm sure Your Honor does as well. In no way did this come close to prejudicing Mr. Hall or Mr. Moore in a way that would require a new trial. [¶] In fact, what this court did was exactly what it said it would, it prophylactically removed Mr. Hall before there could be any kind of disruption or prejudice attached to this case."

Agreeing with the prosecution, in denying the new trial motion, the trial court stated: "[W]ith regard to the outbursts, I will point out that there was no screaming actually before the jury, as [the prosecutor] indicated. There were merely statements made by Mr. Hall which interrupted the testimony and the questioning as it was going on. [¶] I believe that I gave proper curative instructions during all of these, and the jury was admonished appropriately. And, as [the prosecutor] pointed out, I did elaborate and give

19

extensive warnings to Mr. Hall concerning his potential removal from the courtroom. He ignored my warnings. And each time that he did an outburst, I removed him. I did allow him to return after he had calmed down."

While there is no doubt Hall was disruptive at trial, the trial court's comments make clear that the disruption was not of the sort that would cause jurors to feel threatened. As the court told the jurors when it first ordered Hall removed from the courtroom, Hall "clearly was emotional and was unable to control himself." But, as described by the prosecutor and the court, his misbehavior was confined to speaking out of turn; there were no threatening physical motions, there was no yelling, and there were no threats of violence.[17] Further, after being removed due to his interruptions of Gomer's and Ehrhardt's testimony early in the trial, Hall was present without incident for almost five full days, until he was again unable to control his interruptions during appellant's attorney's closing argument. The disruptive influence was thus neither as egregious nor

---

[17] Appellant states in his opening brief that Hall "became sufficiently threatening to require the intervention of the bailiff" and "[e]ven after his removal, his yelling and screaming from the holding cell outside the courtroom was loud enough for the court reporter to record his statements on the record."

The events referred to occurred after the jury had reached its verdicts on the substantive charges, during the trial on the priors. Hall interjected comments at several points during the court's instructions to the jury and attorneys' arguments, including "[s]o I go down for life, man," "I didn't even go to prison," "[c]omings and goings, I only went to prison once . . . . What you mean back and forth to prison?" After the court called a recess and ordered Hall removed, the transcript reflects the bailiff telling Hall, "[k]eep your hands on the back of the chair" and "[l]ook forward." During the continuation of the prosecutor's argument, as the court described for the record, "Mr. Hall was making a lot of noise and saying a lot of things from the holding cell that could be heard, clearly heard by the jury by their reaction, and I could hear it as well concerning his case and his prior convictions." The reporter's transcript continues, "DEFENDANT HALL: [From inside the holding cell.] You can have somebody touch your girl and then they find you guilty for robbery. One of your (unintelligible) don't even take it into consideration, and tell you the truth, nothing but the truth."

Since these events occurred after the jury reached its verdicts on the substantive charges, they are not relevant to our determination whether appellant's convictions were undermined by prejudice from Hall's conduct.

20

as constant as appellant portrays. Moreover, Hall's conduct was in no way linked to appellant. Whatever feelings Hall's outbursts might have engendered in the jurors about *Hall*, this record does not support a conclusion that Hall's conduct caused undue prejudice to *appellant*. [18]

**B.**

Appellant's second point is that he was prejudiced by the recording played for the jury of Hall's call from jail to Contreras. This argument is another form of the one discussed above—that appellant was prejudiced by Hall's conduct, this time as reflected in the recorded call.

The admissibility of the recording was initially discussed after voir dire and before the jury was sworn. The court concurred with Hall's attorney's description of the recording as "extremely prejudicial" and depicting Hall as "somebody with a violent temper, yelling and screaming on the phone to his girlfriend." The court agreed that the recording was "extremely vociferous, loud, offensive" and the "tone of voice is offensive, implies certain violent nature on the part of the speaker," but pointed out that Hall generated the phone call and it was "very probative." The court stated that it was "very clear all the way through that [Hall] was attempting to get [Contreras] to make some

---

[18] None of the cases appellant cites is helpful in assessing the effect on a jury of a codefendant's behavior at trial. (*Sandoval v. Calderon* (2001) 241 F.3d 765, 772 [no prejudice from joinder of counts where evidence of each set of crimes would have been admissible in separate trial on other set of crimes]; *Grisby v. Blodgett* (1997) 130 F.3d 365, 370 [joint trial not prejudicial where evidence defendant claimed would have been admissible in separate trial would not have clearly exculpated defendant]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 342 [prejudice from improper evidence that defendant was ex-convict not curable by admonition]; *United States v. Garza* (5th Cir. 1979) 608 F.2d 659, 666 [prosecutorial misconduct; effect of repeated transgressions not curable by admonition].) The general point that it may be impossible for jurors to ignore extremely damaging information (*Sandoval*, at p. 772 [danger of prejudice because "it is difficult for a jury to compartmentalize the damaging information"]; *People v. Ozuna, supra,* 213 Cal.App.2d at p. 342 ["human mind is not so constructed as to permit a registered fact to be unregistered at will"]; *Garza,* at p. 666 [" ' "if you throw a skunk into the jury box, you can't instruct the jury not to smell it" ' "]) begs the question whether Hall's disruptive conduct would have prejudiced appellant in the jurors' eyes.

contact . . . with someone who was involved with this offense, to somehow alter testimony or to deter him from testifying or deter him from coming forward. The constant reference is made to the fact the next day is the preliminary hearing, that he's spending his time reading the law books, examining the case.

Before playing the recording at trial, the court instructed the jurors: "[Y]ou are not to consider this tape recording or the evidence you are about to hear in the case against Mr. Moore. It is confined to the case as to Mr. Hall."

After the tape was played, outside the presence of the jury, Hall's attorney moved for a mistrial, arguing that the portions of the tape where Hall was shouting were "extremely loud," it was "very disturbing, and the admissibility of [the tape] was ruled [upon] after voir dire. . . ." He had not been able to question the jurors "as to whether they would be prejudiced against [Hall]" if they heard him use words that are "offensive towards women." Counsel stated that there were eight women on the jury, 11 jurors appeared to be Caucasian and one man might be Filipino, and counsel doubted the language on the recording was language they heard or used in their daily lives. The prosecutor responded that this concern should have been raised before the tape was played, and the words were Hall's own. The court denied the mistrial motion, noting that a cautionary instruction regarding the language could have been given and still could be fashioned, and that the recording was played at a constant volume, starting with "normal conversational tone" and increasing in volume as a result of Hall raising his voice. The court stated, "For the same reason that I denied your motion to exclude the tape as being prejudicial, your client caused the prejudice by the shouting and the use of the language and I am using that to deny your motion for mistrial." The court explained its ruling to Hall, who, after confirming the jury had heard the recording, said, "I'm not even that type of person."

In its instructions to the jury, the court again admonished the jury not to use the recorded call as evidence against appellant: "You have heard evidence that the defendant Elijah Matthew Hall made a statement before trial. You may consider that evidence only against him and not against any other defendant."

22

What the jury heard in the recorded phone call was considerably more volatile and threatening than anything displayed in Hall's conduct at trial. Regardless of the degree to which this may have damaged Hall's case, however, we are not persuaded that it resulted in "gross unfairness" (*Hajek, supra,* 58 Cal.4th at p. 1173) to appellant. The court instructed the jury to limit consideration of this evidence to Hall's case, and we presume the jury followed the court's instructions. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 43-44 (*Coffman*).) The fact that appellant did not demonstrate the lack of restraint and composure shown by Hall at trial, and reflected in the phone call, would have diminished any risk of jurors assuming appellant shared Hall's tendencies or approved of his conduct. The actual contents of the phone conversation did not refer to appellant or in any way tie Hall's comments to him.

Appellant attempts to underscore the prejudicial effect of the recording by noting that the prosecutor played excerpts from it seven times during closing argument. Since the portions played were not reported, the record does not indicate what was said in the excerpts played. It appears, however, that at six points, the prosecutor was using the recording to illustrate arguments that Hall wanted Contreras to call Cowan, that he did not want to "say a whole lot" on the call he knew was being recorded and wanted her to visit him so they could talk without being recorded, that the call he wanted her to make was the one Cowan testified he received—an attempt to suppress evidence by offering Gomer money to refrain from testifying—and that Hall made an adoptive admission when Contreras said she had "nothing [to] do with it" and Hall did not say he had "nothing to do with it." None of these arguments had anything to do with appellant.

Appellant points to one instance in which he claims the prosecutor "circumvented the instructions limiting the evidence of the tape to Mr. Hall when he used its 'extremely loud,' very disturbing' and 'extremely offensive' language, to argue Mr. Moore's guilt as an aider and abettor, who had prevented Mr. Ehrhardt from coming to the aid of his friend, Mr. Gomer."

The argument to which appellant refers was as follows: "Mr. Moore is charged in count 4 as aiding and abetting Mr. Hall in his attack on Mr. Gomer, and that's under the

23

theory that he essentially prevented Mr. Ehrhardt from doing anything to help his friend. That was kind of the scenario I was telling you about. He had his back." At this point, the prosecutor played a portion of the recording, then continued his argument: "Manipulation. This robbery was committed by manipulation. It got these two guys into the house and in the absolute confidence of the victims. Manipulation. Manipulation got Ms. Contreras here on the witness stand and testified to you that she was molested. Mr. Hall said them motherfuckers ain't even, they ain't even got a tenth of my brain. They ain't even got a—they ain't even got a little bit of it, you see what I'm saying? [¶] . . . [¶] Them motherfuckers on the sidelines where they supposed to be because a lot of motherfuckers out there. He's manipulating. [¶] Mr. Hall and Mr. Moore committed a robbery. Using manipulation they committed a brutal attack on those two victims . . . ."

Since the record does not inform us of the content of the excerpt played at this point, we are unable to assess whether the prosecutor was using it to bolster the argument immediately preceding it (as appellant urges) or the argument immediately following it. Having listened to the entire call, however, we can say that it never refers to appellant, to an assault, to appellant "having [Hall's] back" or any other detail of the incident bearing on appellant aiding and abetting the assault. It does support the prosecutor's theme of manipulation by Hall, which the prosecutor was using to argue that the robbery was planned and perpetrated by means of "teamwork," as he had described before his brief digression to address the other counts. But the recording's visceral demonstration of Hall attempting to manipulate Contreras was not connected to appellant.

In denying the motion for new trial, the court said that in the tape Hall "came across as very abusive, very loud, profane. Certainly its introduction was prejudicial as to Mr. Hall, but not as to Mr. Moore, as I advised the jury very carefully that they were not to, in fact, consider this against Mr. Hall." We see no reason to depart from the presumption that the jury followed the court's instructions. (*Coffman, supra,* 34 Cal.4th at pp. 43-44.)

24

Appellant further argues he was prejudiced by the joint trial because his defense and Hall's were inconsistent and incompatible. Hall's defense, as described above, was that although he assaulted Gomer and Ehrhardt because he believed Contreras had been molested, he had nothing to do with the robbery. Appellant's defense was misidentification. He argues that the prosecution witnesses' identifications of him were uncertain, but his defense was destroyed when Hall testified that appellant was in fact the person called K who had been with him at Gomer's house.

"When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial. (*People v. Keenan* (1988) 46 Cal.3d 478, 499–500.)" (*Coffman, supra,* 34 Cal.4th at p. 40.) While conflicting defenses may be a reason for severance (see *id.* at p. 41), " '[i]f the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' " (*Ibid.*, quoting *People v. Hardy* (1992) 2 Cal.4th 86, 168.) " 'Severance is not required simply because one defendant in a joint trial points the finger of blame at another. " ' "Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that this conflict *alone* demonstrates that both are guilty." ' [Citation.] When, however, there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance." [Citation.]' (*People v. Homick, supra,* 55 Cal.4th at p. 850; see also [*People v.*] *Letner and Tobin* [(2010)] 50 Cal.4th [99,] 150.)" (*Hajek, supra*, 58 Cal.4th at p. 1173.)

Here, strong evidence tied appellant to the crimes independent of Hall's identification. Ehrhardt, Huff, Cowan, and Dumolin identified appellant in photographic lineups soon after the incident. Gomer did not, nor did Boyd, but both identified

appellant at trial. Erhardt also identified appellant at trial, as did Huff.[19] Cutting identified appellant as the person who fled from the police in the car in which Contreras and Hall had arrived at the location arranged by the police on May 11, a car that fit the description of the one in which Ehrhardt saw appellant drive to Gomer's house on May 9, and also had seen appellant driving the prior weekend, when Hall came to the house looking for Gomer. Contreras, while she attempted to avoid identifying appellant, eventually acknowledged ("I guess so") that appellant was the person she knew as "K," with whom she and Hall left Gomer's house, and who drove them to Santa Rosa the next day in a car that belonged to K. Contreras had told Detective Cutting that she left Gomer's house on the night of the incident with Hall, appellant and Buddy Walker.

In arguing that Hall's testimony identifying him was irreconcilable with his own, appellant points to the prosecutor's emphasis in closing argument on Hall's identification of appellant. The prosecutor told the jury, "Folks, there is no ID issue here. Mr. Hall himself identified Mr. Moore. . . . I asked Mr. Hall point blank who is K, and he pointed him out as Kevin Moore. Okay? There is no reasonable doubt. There is no doubt. There is no doubt that man is K. And [appellant's counsel] talked about the expert that came in and testified about all the different factors that witnesses are affected by and their recall, but none of that changes the fact that the ID issue in this case has been effectively just taken off the table."

Hall's testimony identifying appellant was damaging, to be sure.[20] But, as we have said, the other evidence connecting appellant to the offenses was strong.[21]

_____

[19] Huff was 90 percent sure of his pretrial identification from the photographic lineup, and he testified at trial that appellant was the person he picked in the lineup.

[20] Appellant points to the trial court's acknowledgment, at the hearing on appellant's postverdict motion to substitute counsel, that Hall's testimony "negated" appellant's defense. The trial court stated, "I will acknowledge, and [defense counsel] certainly will acknowledge, that you were somewhat taken aback and sandbagged by the testimony of your codefendant, Mr. Hall, who negated everything that [defense counsel] was attempting to do during the first two weeks of the trial and pinpointed you as one of the coparticipants, thereby eliminating the defense that [defense counsel] was attempting to develop. Which frankly from what I saw may have been effective if Mr. Hall had not

26

Appellant was entitled to a fair trial; he was not entitled to avoid relevant and admissible evidence. And appellant offers no reason to believe Hall would not have provided the same testimony if the trials had been severed. "While '[a]n important element of a fair trial is that a jury consider *only* relevant and competent evidence bearing on the issue of guilt or innocence,' [(*Bruton v. United States* (1968) 391 U.S. 123, 131, fn. 6] (emphasis added), a fair trial does not include the right to exclude relevant and competent evidence. A defendant normally would not be entitled to exclude the testimony of a former

---

testified." With respect to the *Marsden* motion, the court found that defense counsel's handling of the situation was competent. As will be seen, the court also found that the evidence against appellant, apart from Hall's testimony, was strong.

[21] This was the court's reason for denying appellant's motion for a new trial. The court explained, "[T]he only thing that Mr. Hall testified to that was injurious to Mr. Moore was the fact that he named who K was and said it was, in fact, Mr. Moore. The entire testimony concerned a direct identification of Mr. Hall involved in this robbery and another individual—actually, two other individuals, one of whom was named as K. There was a hazy recognition of Mr. Moore by one of the witnesses as possibly the individual known as Mr. K; however, it was not until Mr. Hall testified that Mr. Moore himself was identified as the person that had previously been referred to as K. [¶] This was the extent of the testimony that Mr. Hall gave that was injurious to Mr. Moore. Given that, I am looking at the remainder of the evidence against the individual who participated in this robbery. As [the prosecutor] pointed out, there was evidence that this other party known as K directly was participating in the robbery. It was solely when Mr. Hall identified who his coparticipant was that Mr. Moore actually was identified. [¶] . . . [¶] I, therefore, feel that the evidence against Mr. Moore was—I agree with [the prosecutor], it was strong evidence. You take the participation of K, later identified as Mr. Moore, in the robbery itself, in the event, you have his flight and his abscondence, and there was very strong evidence, aside from Mr. Hall's testimony, that would inculpate Mr. Moore."

In stating that appellant was not identified until Hall testified, it appears the court was considering only the testimony of the victims and not the others who had been at the house earlier, several of whom identified appellant. While Gomer did not identify appellant from the photographic lineups he was shown after the incident, he testified at trial that he was "99.9 percent" confident appellant was the "older gentleman" who had been at his house that night. Ehrhardt identified appellant both from the photographic lineups and at trial. It is not clear why the trial court felt there was only a "hazy recognition of Mr. Moore by one of the witnesses as possibly the individual known as Mr. K."

27

codefendant if the district court did sever their trials, and we see no reason why relevant and competent testimony would be prejudicial merely because the witness is also a codefendant." (*Zafiro v. United States* (1993) 506 U.S. 534, 540.)

## II.

Appellant contends the jury was not properly instructed on aiding and abetting in that it was not told he needed to have the intent to steal at the time he aided the assault on Gomer. Instead, appellant urges, the instructions given improperly allowed the jury to convict him if it found he formed the intent to steal at any time before he and Hall reached a place of temporary safety with the stolen property—specifically, that the instructions improperly permitted the jury to convict him of robbery if he formed the intent to steal after he joined in the assault.

"A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime." (*People v. Cooper* (1991) 53 Cal.3d 1158, 1164, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 561.) "*Beeman* presupposes that, if a person in fact aids, promotes, encourages or instigates commission of a crime, the requisite intent to render such aid must be formed *prior to or during* 'commission' of that offense. (*Beeman,* at p. 558 [imposing aider and abettor liability because defendant intended to provide aid 'prior to' commission of robbery]; *People v. Mitchell* (1986) 183 Cal.App.3d 325, 330 [upholding aiding and abetting conviction based on inference of knowledge of robbery 'during the actual taking'].) It is legally and logically impossible to both form the requisite intent and in fact aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." (*Cooper,* at p. 1164.)

"For purposes of determining aider and abettor liability, the commission of a robbery continues until all acts constituting the offense have *ceased.* The taking element of robbery itself has two necessary elements, gaining possession of the victim's property and asporting or carrying away the loot. (See *People v. Perhab* (1949) 92 Cal.App.2d

28

430.) Thus, in determining the duration of a robbery's commission we must necessarily focus on the duration of the final element of the robbery, asportation.

"Although, for purposes of establishing guilt, the asportation requirement is initially *satisfied* by evidence of slight movement (see *People v. Clark* (1945) 70 Cal.App.2d 132, 133), asportation is not confined to a fixed point in time. The asportation continues thereafter as long as the loot is being carried away to a place of temporary safety. Therefore, in order to fulfill the requirements of *Beeman, supra,* 35 Cal.3d 547, for conviction of the more serious offense of aiding and abetting a robbery, a getaway driver must form the intent to facilitate or encourage commission of the robbery *prior to or during the carrying away of the loot to a place of temporary safety.*" (*People v. Cooper, supra,* 53 Cal.3d at pp. 1164-1165, fns. omitted.)

Here, the trial court instructed the jury that "[a] person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator. . . . To prove a defendant is guilty based on aiding and abetting, the People must prove that, one, the perpetrator committed the crime. Two, the defendant knew the perpetrator intended to commit the crime. Three, during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime. And, four, the defendant's words or conduct did, in fact, aid and abet the perpetrator's commission of the crime."

Defining robbery, the court instructed: "To prove that a person is guilty of this crime, the People must prove that, one, the defendant took property that was not his own. Two, the property was taken from another person's possession and immediate presence. Three, the property was taken against the person's will. Four, the defendant used force or fear to take the property or prevent the person from resisting. And five, when the person used force or fear to take the property, he intended to deprive the owner of it permanently or to remove it from the owner's possession for so extended a period of time that the owner would be deprived of a major portion of the value or enjoyment of the property. [¶] The defendant's intent to take the property must have been formed before or during the time he used force or fear. If the defendant did not form this required intent until after using the force or fear, then he or she did not commit robbery." After further

29

discussion of the elements of robbery, the court instructed, "To be guilty of robbery as an aider and abettor the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety."

Appellant takes issue with the last quoted portion of the instructions. The instruction, however, is entirely consistent with the law as explained in *Cooper.* Appellant complains that the jurors might have convicted him because they believed he helped Hall escape with the stolen property even if they did not believe he had any idea Hall intended to steal when appellant "had [Hall's] back" during the assault. His argument assumes that the only thing he did to aid and abet Hall was to assist in the assault on Gomer by preventing Ehrhardt from helping Gomer, so that he had to share Hall's intent to steal before or during the assault, not afterward. But appellant drove the car in which both defendants left the scene. If the jury believed he formed the intent to help Hall steal after the assault and in fact assisted in the robbery by driving Hall away from the house with the stolen property, finding appellant guilty for aiding and abetting on this theory would have been perfectly proper.

In any event, it is all but impossible to believe the jury believed appellant formed the intent to assist in the robbery only after he assisted in the assault on Gomer. The only explanation for the sudden assault other than as part of the robbery was Hall's assertion that he assaulted the victims because he believed Contreras had been molested. This explanation was not credible: It came only from Hall and, according to his testimony, the molestation occurred while Contreras was lying on the couch in the living room in front of a number of people who were there at the time but, apparently, did not see it happen. Moreover, the jury rejected Hall's explanation. Having concluded that Hall assaulted the victims with the intent to rob them, and considering Ehrhardt's testimony that appellant did not look surprised when he saw Hall assaulting Ehrhardt, there can be little question that the jury believed appellant shared Hall's intent.

## DISPOSITION

The judgment is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.


*People v. Moore* (A140333)